Mark P. Robinson, Jr. (SBN 54426)
Kevin Calcagnie (SBN 108994)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA  92660
Tel:  (949) 720-1288 / Fax:  (949) 720-1292
mrobinson@robinsonfirm.com
kcalcagnie@robinsonfirm.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CONOR CORKERY, an individual, TOM HADDAD, an individual, THOMAS JOSEPH, an individual, and WILLIAM KIRK, an individual, on behalf of themselves, and those similarly situated, | Case No. |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| JUUL LABS, INC., and PAX LABS, INC., | |
| Defendants. | |

Plaintiffs CONOR CORKERY, TOM HADDAD, THOMAS JOSEPH, and WILLIAM KIRK, by and through their counsel, bring this Class Action Complaint ("Complaint") against Defendants, on behalf of themselves and those similarly situated, seeking medical monitoring, monetary damages, declaratory, injunctive, punitive damages,

and all other relief the Court deems appropriate. The following allegations are based upon information and belief, including investigation by Plaintiff's counsel, unless otherwise stated.

## INTRODUCTION

1.      Decades of legislation and litigation has prevented the major cigarette manufacturers from marketing to young people. As a result, youth smoking decreased to its lowest levels in decades. While the public health community celebrated this decline as a victory, Defendants saw an opportunity. In 2015, JUUL set out to recapture the magic of the cigarette. JUUL seized regulatory inaction and loopholes for e-cigarettes, and it set out to develop and market a highly addictive product that could be packaged and sold to young people. Youth is and has always been the most sought-after market for cigarette companies, because they are the most vulnerable to nicotine addiction and are most likely to become customers for life. JUUL is the most recent company to try and recapture this population.

2.      JUUL was designed perfectly for adolescents and teens. It does not look or smell like a cigarette. Rather, it has a sleek, high-tech, youth-friendly battery-powered device that looks like a USB drive, easy to hide from parents or teachers. The JUUL device heats a nicotine-filled liquid JUUL pod, sold separately in fun flavors like mango and cool mint, delivering powerfully potent doses of nicotine, along with aerosol and other toxic chemicals into the lungs, body, and brain. Unlike noxious cigarette smoke, when a JUUL user exhales, the smoke is undetectable.

3.      JUUL is small, easily concealable and can be used practically anywhere without parents or teachers knowing, which is all a part of JUUL's appeal. This has been fostered and bolstered by JUUL's viral marketing campaigns using young models to make the products look cool and stylish. Below is a photograph of the JUUL device. Notice the similarity to a USB stick, which makes the JUUL easily concealable for teens:

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10



11  4.  Defendants designed the JUUL product to quickly and severely addict young

12  people to nicotine, one of the most addictive chemicals in the world. By studying cigarette

13  industry archives, JUUL learned how to manipulate the nicotine in its products to maximize

14  addictiveness, particularly among new users and young people, and thereby increase sales.

15  JUUL designed its products to have maximum inhalability, without any "throat hit" or

16  irritation that would serve as a natural deterrent to new users. The purpose of this design

17  element was to initiate new smokers, since those who already smoke cigarettes are tolerant

18  to the throat hit sensation and associate it with smoking and nicotine satisfaction. At the

19  same time, JUUL designed its device to deliver substantially higher concentrations of

20  nicotine per puff than traditional cigarettes and most other e-cigarettes. This combination

21  of ease of inhalation and high nicotine delivery makes JUUL both powerfully addictive and

22  dangerous.

23  5.  JUUL has created an epidemic. According to Alex Azar, the Secretary of the

24  U.S. Department of Health and Human Services, "We have never seen use of any substance

25  by America's young people rise as rapidly as e-cigarette use is rising."[1] JUUL's conduct

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[1] Surgeon General releases advisory on E-cigarette epidemic among youth, U .S. Department of Health & Human Services
28  (Dec. 18, 2018), www.hhs.gov/about/news/2018/12/18/surgeongeneral-releases-advisory-e-cigarette-epidemic-among-
youth.html (as of July 5, 2019).

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

has led to a surge in teen e-cigarette use, creating the "largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S.'" In a mere two years, JUUL undid more than a decade of progress in reducing teen smoking, thereby increasing nicotine use among teenagers to levels not seen since the early 2000s. Plaintiffs and the Class were both a target and a victim of JUUL's conduct.

6.     From July 24 to 25, 2019, the Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform of the United States House of Representatives held a hearing on "Examining JUUL's Role in the Youth Nicotine Epidemic." After reviewing the testimony given in the Subcommittee's hearing, the United States Food and Drug Administration sent JUUL a Warning Letter based on its deceptive claims. The FDA noted four particularly concerning statements that JUUL made to children in school:

      a. A JUUL representative stated that **JUUL "was much safer than cigarettes"** and that "FDA would approve it any day."

      b. A JUUL representative stated that **JUUL was "totally safe**."

      c. A JUUL representative stated that a student "… should mention JUUL to his friend … because that's **a safer alternative than smoking cigarettes**, and it would be better for kids to use."

      d. A JUUL representative stated that "FDA was about to come out and say it [JUUL] was **99% safer than cigarettes**…and that…would happen very soon…."[2]

7.     JUUL's marketing worked. As the nation's youth suffers from a "Nicotine Epidemic," JUUL has made billions. JUUL's sales increased 641% from 2016 ($2.2 million) to 2017 ($16.2 million):

---

[2] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL



King, B., et al., Electronic Cigarette Sales in the United States, 2013-2017, JAMA, 2018 Oct 2; 320(13): 1379–1380.

8.    In February 2019, JUUL Labs, Inc. ("JUUL Labs") told its investors that it forecasts its 2019 sales at $3.4 billion dollars. If JUUL Labs meets its financial forecast this year, it will have sold almost three times more than it did in 2018.[3] JUUL's founders are now billionaires.

**PARTIES**

9.    Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes. JUUL ratified each and every act or omission alleged herein in proximately causing the injuries and damages alleged herein.

10.    Defendant PAX Labs, Inc. ("PAX") is a Delaware Corporation, having its principal place of business in San Francisco, California. JUUL Labs, Inc. was originally a part of PAX, but was spun out as a separate company in 2017. A substantial portion of the conduct stated here occurred while JUUL was part of PAX.

---

[3] https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

11.     Plaintiff CONOR CORKERY was both a target and victim of Defendants' conduct.  Mr. Corkery is a resident of Irving, Texas.  At age 19, Mr. Corkery began using and purchasing JUUL vaping products from various stores that specifically marketed JUUL products.  Mr. Corkery was not aware that JUUL had been specifically designed to develop and maximize the addictive effects of nicotine, and that it contained and put extremely high doses of nicotine into the bloodstream. Mr. Corkery was not aware that of the health risks that JUUL carried. Mr. Corkery relied on Defendants' representations that the product was safe, not harmful, and fun. Mr. Corkery was attracted to, and still uses, JUUL due to his addiction to the product. Defendant never disclosed that it had manipulated the nicotine in JUUL as described below to deliver massive doses of nicotine that could cause addiction in Mr. Corkery almost immediately, and that he will now fight for the rest of his life.

12.     Plaintiff TOM HADDAD was both a target and victim of Defendants' conduct. Mr. Haddad is a resident of Encinitas, California.  At age 17, Mr. Haddad began using and purchasing JUUL vaping products from various stores that specifically marketed JUUL products.  Mr. Haddad was not aware that JUUL had been specifically designed to develop and maximize the addictive effects of nicotine, and that it contained and put extremely high doses of nicotine into the bloodstream. Mr. Haddad was not aware that of the health risks that JUUL carried. Mr. Haddad relied on Defendants' representations that the product was safe, not harmful, and fun. Mr. Haddad was attracted to, and still uses, JUUL due to his addiction to the product. Defendant never disclosed that it had manipulated the nicotine in JUUL as described below to deliver massive doses of nicotine that could cause addiction in Mr. Haddad almost immediately, and that he will now fight for the rest of his life.

13.     Plaintiff THOMAS JOSEPH was both a target and victim of Defendants' conduct. Mr. Joseph is a resident of Trabuco Canyon, Orange County, California. At age of 20 or 21, Mr. Joseph began using and purchasing JUUL vaping products from various stores that specifically marketed JUUL products. Mr. Joseph was not aware that JUUL had been specifically designed to develop and maximize the addictive effects of nicotine, and that it contained and put extremely high doses of nicotine into the bloodstream. Mr. Joseph was

not aware that of the health risks that JUUL carried. Mr. Joseph relied on Defendants' representations that the product was safe, not harmful, and fun. Mr. Joseph was attracted to, and still uses, JUUL mint due to his addiction to the product. Defendant never disclosed that it had manipulated the nicotine in JUUL as described below to deliver massive doses of nicotine that could cause addiction in Mr. Joseph almost immediately, and that he will now fight for the rest of his life.

14.     Plaintiff WILLIAM KIRK was both a target and victim of Defendants' conduct. Plaintiff is a resident of San Diego, San Diego County, California. At around age 21, Mr. Kirk began using JUUL products, such as those described in the subject complaint. Mr. Kirk was not aware of the health risks that JUUL carried. Mr. Kirk relied on Defendants' representations that the product was safe, not harmful, and fun. Mr. Kirk was attracted to, and still uses his JUUL device due to his addiction to the product.

15.     Defendants never disclosed that it had manipulated the nicotine in JUUL as described below to deliver massive doses of nicotine that could cause addiction in Mr. Kirk almost immediately, and that he will now fight for the rest of his life.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states. Defendant JUUL Labs, a Delaware corporation, is a citizen of Delaware, and Plaintiff CORKERY is a citizen of Texas, and Plaintiffs TOM HADDAD, THOMAS JOSEPH and WILLIAM KIRK are citizens of the State of California.  This Court also as subject matter jurisdiction based on the diversity of the parties. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one or more claims herein arise under federal law.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this Court under 28 U.S.C. § 1391 because (1) JUUL is headquartered in this District; and (2) JUUL regularly transacts and solicits business in this District.

## COMMON FACTUAL ALLEGATIONS

**Defendants Developed their JUUL e-cigarette to Recreate the "Luxury" of Tobacco**

18.     Defendant JUUL Labs, Inc. and Defendant PAX Labs, Inc. first began as Ploom, Inc., back in 2007. The company's founders, Adam Bowen ("Bowen") and James Monsees ("Monsees"),invented the Ploom, a cigarette-shaped device  into which pre-filled pods of ground tobacco were inserted and vaporized at lower-than-combustion temperatures using an electrical heating element.

19.     In 2014, Bowen, Monsees and others applied for a patent for the JUUL device, which is the subject of this Complaint, and which was an electronic device to administer nicotine to its user.  The nicotine solution used in JUUL devices is derived from tobacco.

20.     The following year, around 2015, PAX announced the JUUL e-cigarette and raised nearly $50 million in funding from Fidelity Investments and investors, presumably to aid in the manufacturing, marketing, and sales of their JUUL e-cigarettes.

21.     Not long after, inn 2017, PAX Labs, Inc. was renamed JUUL Labs, Inc. which retained the tobacco-related business.  Also spun off was the marijuana-thc branch, which became a new entity, also called PAX Labs, Inc.

22.     Both Bowen and Monsees remained at JUUL. Bowen is now JUUL's Chief Technology Officer and Monsees is JUUL's Chief Product Officer. This very year, JUUL became the dominant e-cigarette company in the United States, growing revenues by 700%. JUUL is the most dominant player in the e-cigarette industry.

23.     JUUL's founder and its employees make clear their intent to develop a highly addictive product to sell to a new audience of non-smokers. Monsees, described the cigarette as "the most successful consumer product of all time . . . . an amazing product." However, because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category." (emphasis added)

24.     Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." With a focus on recreating the "ritual and elegance that smoking once exemplified," JUUL set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with — or don't necessarily want to be associated with — cigarettes."[4]

25.     JUUL copied the tobacco industry's playbook in order to maximize its business. Monsees has even publicly admitted that JUUL began by looking at tobacco industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the tobacco industry, governmental officials, and injured smokers. "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

26.     JUUL's research included learning how tobacco companies chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."

27.     JUUL also used tobacco industry advertisements designed to lure non-smoking youth to use its products, in its own advertising campaigns. In a 2018 interview, Monsees indicated JUUL's advertising had been informed by traditional tobacco advertisements.

28.     The JUUL device itself is comparable in size to a pack of chewing gum or USB key. The thin, rectangular device consists of an aluminum shell, a battery, a magnet (for the USB charger), a circuit board, an LED light, and a pressure sensor. The JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the flow of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn

---

[4] http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees/

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

converts the nicotine solution in the JUULpod into a vapor consisting principally of the following: nicotine, benzoic acid, glycerin, and propylene glycol. The JUUL device also indicates battery level via a light in the device, and can light up in a "party mode" which displays a festive array of color when the device is moved.

29.     The design of the JUUL device (including its circuit board) and JUULpod allocates the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, Defendant can finely tune the amount of nicotine vapor the JUUL delivers.

30.     The JUUL product consists of two components: (1) The JUUL device; and (2) the JUUL pods that contain the flavored nicotine that is vaporized. In the photograph of the JUUL Starter Kit reproduced above, the long silver piece is the JUUL device and the black piece at the top is the JUUL pod.

31.     JUUL manufactures and distributes its nicotine formulation as JUUL pods, which contain JUUL's nicotine liquid. JUUL exclusively sells its pods, in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. According to a recent survey of more than 1,000 12 to 17 year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% of users most recently used fruit medley, mango, cool mint, or crème brûlée.[5]

### The "Youth Nicotine Epidemic"

32.     Nicotine is particularly dangerous to young people whose brains are still developing through the mid-20s. Nicotine is highly addictive not only to developing adolescent brains, but to adults, and the results are always the same: long-term nicotine addiction. Addiction to nicotine results in an increased risk of heart and lung disease and stroke; changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions; decreased functionality of the endocrine system; heightened risk of cancer; and negative effects on fertility. As one of the San Francisco

---

[5] http://www.publichealthlawcenter.org/sites/default/files/JUUL-Webinar-Slides-Apr262018.pdf

engineers who invented the JUUL e-cigarette stated: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[6]

33.    The United States Surgeon General has concluded that e-cigarettes, such as JUUL's product, are not safe for anyone under age 26.[7]

34.    Despite e-cigarettes being unsafe for anyone under 26, JUUL heavily promoted its products to young people. Following the wildly successful playbook laid out in historic cigarette industry documents, Defendants leveraged social media and utilized other marketing and promotion tactics, long outlawed for cigarette companies, to capture the highly-lucrative youth market. JUUL preyed on youth using medium and themes that exploit teenagers' vulnerabilities to create and sustain nicotine addiction, all for financial gain, and without giving kids any warnings about the serious risks of addiction, stroke, and other permanent injuries.

35.    The JUUL e-cigarette's defective design poses unprecedented risks of abuse and addiction. The JUUL device does not have a manual or automatic "off" switch. On information and belief, neither the JUUL pod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery. As a result, the JUUL is able to facilitate consumption of levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted to nicotine.

/ / /

/ / /

/ / /

---

[6] https://-www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul

[7] U.S. Surgeon General and the U.S. Centers for Disease Control and Prevention, Office on Smoking and Health, Know The Risks: E-cigarettes and Young People (2019), https://ecigarettes.surgeongeneraLgov/ (as of July 5, 2019).

1

**JUUL's Deceptive Marketing to Adults**

2       36.     JUUL's marketing is not limited to just our nation's children: it also markets

3   its products to adults as an "Alternative to Cigarettes." The very packaging of the JUUL

4   products include the tagline, reads "The Alternative For Adult Smokers."

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22       37.     As the Court will see below, JUUL really means the *safer* alternative.

23       38.     Though the packaging does not explicitly state that the product is a *safer*

24   alternative to smoking, its implication is clear. Further, JUUL represents on its website that

25   it intends consumers to believe that JUUL is a safer alternative to smoking traditional

26   cigarettes.  For example, as of September 2019, JUUL's website reads ""JUUL has enabled

27   more than one million adult smokers to replace cigarettes, and we want to continue to offer

28

meaningful options to adult smokers who want to end their relationship with combustible cigarettes."[8]

39.  JUUL's own CEO, Kevin Burns, has stated "Our mission is to eliminate cigarette smoking in the world by providing adult smokers with a true alternative to cigarettes… Tobacco smoking is still the leading preventable cause of death and disease in the U.S. Vapor technology offers the potential to improve the lives of adult smokers. We remain steadfast in our commitment to fund clinical and behavioral research to add to the growing body of scientific evidence regarding vapor technology."[9]

40.  In the Warning Letter that FDA sent JUUL Labs, FDA noted that a May 8, 2018 "Letter from the CEO" stated JUUL's "simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want **without the combustion and the harm associated with it**." The May 8, 2018 "Letter from the CEO" has since been removed from JUUL's website.[10]

41.  As set forth below, despite its founder's clear intent to create a "luxury" consumer product for people who do not smoke that is as addictive as cigarettes, JUUL has consistently marketed itself as an "alternative" to cigarettes, causing people to choose JUUL on the belief that it is less addictive and less dangerous than cigarettes. JUUL failed to disclose that: (1) contrary to JUUL's representations, there is a higher concentration of nicotine per pod than a pack of cigarettes, and (2) even if the nicotine concentration were comparable, the unique way in which a JUUL vaporizer dispenses nicotine renders it more harmful and more addictive than cigarettes, which is problematic for everyone, but particularly for minors.

42.  That JUUL's marketing resembles the tobacco industry's marketing is no accident. In a 2018 interview, one of JUUL's founders "indicated that the design of JUUL's

---

[8] https://newsroom.juul.com/2018/07/12/juul-labs-will-make-3-nicotine-pods-widely-available/
[9] https://newsroom.juul.com/2018/06/28/new-survey-results-address-impact-of-juul-use-on-eliminating-or-reducing-cigarette-consumption/
[10] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

advertising had been informed by traditional tobacco advertisements…" Robert K. Jackler, M.D. et al, JUUL Advertising Over Its First Three Years on the Market (Jan. 21, 2019)[11].

**Nicotine Addiction**

43.    Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and a relaxant, nicotine affects the central nervous system; increases in blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.

44.    The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user. In other words, users have to inhale more and more JUUL vapor as time goes on to get the same effect.

45.    Nicotine addiction and subsequent cessation of nicotine causes the classic "withdrawal" symptoms: depression, irritability, anxiety, restlessness, headaches, sweating, insomnia, heart palpitations and tremors. And, of course, nicotine withdrawal leads to intense desire to consume more nicotine.

/ / /

/ / /

---

[11] http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf

### JUUL's Nicotine Delivery System

46.   According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[12] The cigarette industry has long known that "nicotine is the addicting agent in cigarettes"[13] and that "nicotine satisfaction is the dominant desire" of nicotine addicts.[14]

47.   Tobacco companies spent decades manipulating nicotine in order to foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'."[15] This kick was attributed to increased nicotine absorption associated with lower pH.[16]

48.   JUUL knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL e-cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier

49.   JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. This reduction in pH converts naturally-occurring unprotonated nicotine, which causes

---

[12] See https://www.ncbi.nlm. nih.gov/books/NBK53018/#ch4.s92
[13] Brown & Williamson official A.J. Mellman, 1983
https://www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine%20Addiction.pdf
[14] R.J. Reynolds Tobacco Co. marketing memo, 1972.
[15] 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."
[16] Neal Benowitz et al., Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, Nicotine Psychopharmacology, 22-29, Handbook of Experimental Pharmacology, vol 192.

irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat. A recent study found that JUUL's e-liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine. J.H. Lauterbach, One More Time: Unprotonated Nicotine in E-cigarette Aerosols: Is It Really There?, https://www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf. Other studies have confirmed the low ratio of freebase nicotine in JUUL products. See Duell, James F. Pankow, and David H. Peyton, Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy, 31 Chem. Res. Toxicol. 431, 431 (2018). The Duell study indicates that the vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a non-salt e-liquid with one-twentieth the amount of nicotine as a JUUL (3 mg/mL compared to the JUUL's 59 mg/mL). Id. The Duell study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." Id., 431-434.

50.    JUUL's creation of a product with low levels of harshness and minimal throat "hit" is consistent with the goal of producing a product for non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation. The design also shows that JUUL's intention was to recruit nonsmokers, not existing smoker, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix. Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers, but is crucial to luring a new generation of users.

51.    JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful. Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation.

Reducing or removing this feedback impairs the user's ability to ascertain that she is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction.

52.    Defendants present their product as a safe alternative to smoking, despite the fact JUULpods deliver dangerous toxins and carcinogens to the body and bloodstream, which is especially true for young users. Nicotine is both a carcinogen and a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.[17] Nicotine also adversely affects the heart, eyes, reproductive system, lung, and kidneys. Even nicotine gum still increases risk of coronary vascular disease by producing acute myocardial ischemia, i.e. reduced blood flow to heart typically as a result blockage, as well as risk of peripheral arterial disorders. Other than being addictive in humans, nicotine also can be used as an insecticide.[18] Additionally, because e-cigarettes introduce foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just as a traditional cigarette would. Vaping also triggers immune responses associated with inflammatory lung diseases.

53.    JUUL products in particular, per a recent study, provide nicotine powerful enough to be cytotoxic. More specifically, "the concentrations of nicotine and some flavor chemicals (e.g. ethyl maltol) are high enough to be cytotoxic in acute in vitro assays, emphasizing the need to determine if JUUL products will lead to adverse health effects with chronic use." [19]

54.    In any event, JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of

---

[17] See Mishra, A., et al., HARMFUL EFFECTS OF NICOTINE, Indian J. Med. Paediatr. Oncol., 36(1): 24–31 (Jan.-Mar. 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.

[18] Id.

[19] Esther E. Omaiye, MS et al., Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations (Dec. 2018), available at: https://www.biorxiv.org/content/biorxiv/early/2018/12/09/490607.full.pdf.

nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[20] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a JUUL pod will easily exceed the nicotine dose of a traditional cigarette.

55.     Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUUL pods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes." Reilly et al., Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes, 3 (the "Reilly study"). The Reilly study tested JUUL's Tobacco, Creme Brulee, Fruit Punch, and Mint flavors found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per puff. Reilly et al. Free Radical. See Appendix B, Chart 7. Reilly's findings were based on a puff volume of 75/mL. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 µg/puff. M.J. Schroeder and A.C. Hoffman, Electronic Cigarettes and Nicotine Clinical Pharmacology, Tobacco Control 2014; 23:ii30-ii35. Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 µg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

56.     Plaintiff is informed and believes, and based thereon alleges, at all relevant times alleged herein, the acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint, were fraudulent, willful, malicious, and despicable and were done with a knowing disregard of the rights and safety of Plaintiff and for the primary purpose of increasing Defendants' profits. Defendants' outrageous, fraudulent, despicable,

---

[20] E-cigarettes, https://ec.europa.eu/healthfisites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited June 4, 2018) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

and oppressive conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

57.     Plaintiff is informed and believes, and based thereon alleges, at all relevant times alleged herein, the acts, conduct, and omissions of Defendants were perpetrated by Defendants' officers, directors and managing agents and were done with a willful and knowing disregard of the safety and rights of Plaintiff. Further, Defendants' officers, directors, and managing agents authorized the despicable conduct of Defendants or knew of the wrongful conduct and adopted or approved of the conduct after it occurred.

58.     Plaintiff is informed and believes, and based thereon alleges, that, at all relevant times alleged herein, Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people and was carried on by Defendants with willful and knowing disregard for rights and safety, entitling Plaintiff to exemplary damages under California Civil Code section 3294.

## CLASS ACTION ALLEGATIONS

59.     Plaintiffs bring claims, as noted below, as class claims under Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3), on behalf of a Class consisting of:

> All natural persons in the United States, who paid or incurred costs for any of JUUL's products. Excluded from the Class are employees of JUUL, including its officers or directors, and the Court to which this case is assigned, and any persons who purchased JUUL's products for the purpose of resale.

60.     Plaintiffs Haddad, Joseph, and Kirk also bring claims, as noted below, as class claims under Federal Rule of Civil Procedure 23(b)(1), (b)(2), and (b)(3), on behalf of a subclass consisting of (the "California subclass"):

> All natural persons in the State of California, who paid or incurred costs for any of JUUL's products. Excluded from the Class are employees of JUUL, including its officers or directors, and the Court to which this case is assigned, and any persons who purchased JUUL's products for the purpose of resale.

61.     The proposed Classes are sufficiently numerous, as hundreds of thousands of members of the Class were induced to purchase Defendant's products based on JUUL's acts and omissions. The Class Members are so numerous and dispersed throughout California that joinder of all members is impracticable. The Classes are composed of thousands of consumers, and the disposition of their claims in a Class action will benefit both the parties and the Court.  Defendant sold hundreds of thousands, if not millions, of JUUL devices and pods over the past five years, and thus the Classes are sufficiently numerous to make joinder impracticable, if not outright impossible. The Class Members can be identified by records maintained by Defendants.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class Members are:

    a.     Whether Defendant manufactured, packaged, marketed, distributed, and/or sold JUUL products;

    b.     Whether Defendant's advertising and marketing regarding the JUUL e-cigarette and JUUL pods were likely to deceive Class Members or were unfair;

    c.     Whether Defendant intentionally omitted material information from its advertising and marketing materials;

    d.     Whether Defendant unfairly, unlawfully and/or deceptively induced Class Members to purchase JUUL e-cigarettes and/or JUUL pods using the promise that they would be able to stop purchasing JUUL pods "anytime";

    e.     Whether the JUUL e-cigarette is defective;

    f.     Whether Defendant knew or should have known about the JUUL's defect, and, if yes, how long Defendant has known of the defect;

g.  Whether the defective nature of the JUUL e-cigarette constitutes a reasonable fact consumers would have considered in deciding whether to use or purchase JUUL products;

h.  Whether JUUL had a duty to disclose the defective nature of JUUL e-cigarettes to Plaintiffs and Class Members;

i.  Whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the JUUL e-cigarettes are defective and/or not merchantable;

j.  Whether JUUL had a duty to warn of the risks its products pose;

k.  Whether Defendant breached its duty to warn of the risks its e-cigarettes pose;

l.  Whether the JUUL e-cigarette is unfit for the ordinary purpose for which they were used, in violation of the implied warranty of merchantability;

m.  Whether Defendant engaged in the alleged conduct knowingly, recklessly, or negligently;

n.  The amount of revenues and profits Defendant received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

o.  Whether JUUL's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of Class Members;

p.  Whether JUUL's conduct was despicable and subjected Class Members to cruel and unjust hardship in knowing disregard of their rights;

q.  Whether JUUL intentionally misrepresented or concealed material facts and did so intending to harm Class Members;

r.    Whether Class Members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

s.    Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

63.    Plaintiffs' claims are typical of the claims of the Class because they are based on the same factual, legal, and remedial theories as the claims of the Class. Each Class Member was misled into: (a) purchasing a highly addictive nicotine product due to Defendant's false advertising and unfair business practices; and/or (b) substituting addiction to vaporized nicotine salts in place of addiction to nicotine from cigarette smoking. Thus, Plaintiffs and Class Members sustained the same injuries and damages arising out of Defendant's conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of law as alleged.

64.    Plaintiffs will fairly and adequately represent and protect the interests of the Class because Plaintiffs are similarly situated with, and has suffered similar injuries as, the members of the Class they seek to represent. Plaintiffs believe they have been deceived, wishes to obtain redress of the wrong, and wants Defendants stopped from perpetrating similar wrongs on others. Plaintiff are adequate representative of the Class also because their interests do not conflict with the interests of Class members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation, who have no interests adverse to those of the class, who have the financial resources to adequately and vigorously litigate this class action, and who can and will vigorously prosecute this litigation.

65.    Certification of the Class under Rule 23(b)(1) is appropriate because prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would

1    establish incompatible standards of conduct for Defendants, whose product sales and
2    product marketing efforts are on a state-wide scale.

3        66.    Certification of the Class under Rule 23(b)(2) is also appropriate because
4    Plaintiffs seek injunctive and declaratory relief as detailed below. Defendants acted in the
5    same manner toward the entire class by marketing, representing, and selling the JUUL
6    device and pods through unlawful, deceptive, fraudulent, and otherwise wrongful methods,
7    thereby making appropriate preliminary and final equitable relief with respect to the Class.

8        67.    Certification of the class under Rule 23(b)(3) is also appropriate insofar as
9    damages are sought. The questions of law and fact common to the Class members
10   predominate over any questions affecting only individual members. A class action is
11   superior to other available methods for the fair and efficient adjudication of the controversy,
12   in that:

13           t.    consumers cannot effectively prosecute separate actions for their
14                 individual purchases of JUUL's prodcuts;

15           u.    concentration of the litigation concerning this matter in this Court is
16                 desirable; and

17           v.    the Class is of a moderate size and the difficulties likely to be
18                 encountered in the management of a class action are not great.

19       68.    A class action is superior to other available means for the fair and efficient
20   adjudication of this dispute:

21           w.    Common questions of law and fact predominate over any individual
22                 questions that may arise.

23           x.    No member of the Class has a substantial interest in individually
24                 controlling the prosecution of a separate action. It would be virtually
25                 impossible for the class members individually to effectively redress
26                 the wrongs done to them.

27           y.    It is desirable to concentrate the litigation of these claims in this
28                 forum since many of the acts complained of took place in this district

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

and this forum is convenient to the parties, the Class members, and the potential witnesses. The resolution of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation. JUUL's principal place of business is in this district. JUUL designed and implemented the unlawful and deceptive conduct described herein from its headquarters in this district.

z.  Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.

aa. The Class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of California Consumers Legal Remedies Act)

### Asserted by the California Subclass against all Defendants

69.     Plaintiffs reallege and incorporate by reference all preceding factual allegations as though fully set forth herein.

70.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, et seq.  Plaintiffs will later amend this class action Complaint to seek damages in accordance with the CLRA after providing Defendant with notice as required by Civil Code section 1782.

71.     Plaintiffs and Class members are "consumers," as the term is defined by California Civil Code section 1761, subdivision (d).

72.     Plaintiffs, Class members, and Defendant have engaged in "transactions," as that term is defined by Civil Code section 1761, subdivision (e). Likewise, subscriptions for delivery of JUUL pod nicotine salt cartridges that Class members, and those similarly

situated, purchased are "services" within the meaning of the CLRA. Defendant's actions, representations and conduct have violated, and continue to violate the deception prong of these statutes because they extend to transactions that are intended to result, or which have resulted, in the sale or distribution of goods or services to consumers.

73.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct undertaken by Defendant was likely to deceive consumers.

74.    Civil Code section 1770, subdivision (a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

75.    Plaintiffs, and those similarly situated, relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by not purchasing a JUUL e-cigarette and JUUL pods. Specifically, the plaintiffs viewed and relied upon the above-mentioned advertisements and representations by JUUL

76.    In addition to the specific JUUL advertising described above, each Plaintiff was exposed to JUUL's deceptive advertising message as a result of JUUL's adoption of tobacco industry's long-standing and extensive deceptive advertising campaign to a pervasive viral marketing campaign delivered via social media and email. From the introduction of the JUUL e-cigarette through at least 2018, JUUL used social media to inundate consumers with ads that—like those of the tobacco industry with respect to cigarettes—characterized JUUL e-cigarettes and JUUL pods as a trendy, young, cool activity that made one popular, rather than a means of delivering a highly addictive substance with long-term health effects.

77.    Each Plaintiff saw at least one advertisement in JUUL's long, pervasive advertising campaign and was exposed to the false messages conveyed by the campaign (*i.e.*, that JUUL was less—or at least no more—addictive than traditional cigarettes; that

JUUL e-cigarettes and JUULpods were a trendy, hip, cool and non-dangerous activity, not a means of delivering extremely potent and addictive doses of nicotine). JUUL's campaign lasted several years and was extremely popular and pervasive on social media. This was a "longstanding" campaign like the Camel cigarettes advertising, particularly when compared with the lifespan of the target audience—teens.  It was even more effective than a normal three-year advertising campaign because it co-opted the imagery and messaging of the tobacco industry's decades-long advertising of cigarettes as a stylish, popular activity. Because of the length and pervasiveness of the campaign, it is not reasonable for each Plaintiff to identify in this Complaint every ad seen, but a representative sample of advertisements seen is discussed shown. Additional marketing materials can be found at https://inrejuul.myportfolio.com.

78.    Although individual advertisements within JUUL's campaign vary in their details, common elements includetheir use of young, attractive models to convey the idea that JUUL would make one cool and attractive; use of active, healthy individuals to convey the idea that using JUUL was not unhealthy; and depiction of JUUL nicotine salt solutions as a flavorful "treat" rather than an addictive substance with long-term health effects. Juul exposed each Plaintiff to its campaign and its messaging prior to their purchase of JUUL e-cigarettes and JUUL pods, and continued to be exposed to it even when they tried to quit vaping.

79.    Defendant's practices, acts, policies and course of conduct violated California's prohibition on deceptive practices in that Defendant engaged in deceptive acts and practices in or affecting commerce, through their advertisements and labeling of JUUL e-cigarettes and JUUL pod nicotine salt cartridges. JUUL engaged in a longstanding and extensive marketing campaign that deceived consumers.

80.    Defendant specifically violated the deception prong of the CLRA through the following:

        a.    Omitting, concealing, and suppressing material facts in the labeling and
              advertising of its goods and services;

b.  Misrepresenting the sources, sponsorship, approval, endorsement or certification of goods or services;.

c.  Misrepresenting the affiliation, connection, or association with, or certification by, another for its goods or services;

d.  Misrepresenting that the goods or services that they sell have characteristics, ingredients, uses, benefits, or quantities, which they do not have;

e.  Misrepresenting that the goods or services that they sell are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not;

f.  Advertising goods or services with intent not to sell them as advertised;

g.  Misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

h.  Using innuendo or ambiguity as to material facts when such failure tends to mislead;

i.  Engaging in unconscionable conduct;

j.  Directing conduct at disabled persons, namely minors (traditionally recognized under these states' laws as having the "disability of nonage," "disability of infancy," or similar term) with diminished mental capacity to resist Defendant's advertising, product flavors and addictive nicotine products; caused the loss of assets essential to the health or welfare of the disabled persons (minors); and caused actual physical, emotional, or economic damage to disabled persons (minors), who are substantially more vulnerable than other members of the public to the Defendant's conduct because of their age, impaired understanding and diminished mental capacity;

k.  Using coercion in a transaction with respect to minors;

l.  Failing to honor a warranty;

m.  Soliciting to engage in a consumer transaction without the appropriate permits or licenses;

n.  Misleading about a substance or failing to identify the contents of the package or the nature of the substance contained inside the package;

o.  Misleading or causing misunderstanding as to the effects that a substance causes when ingested, injected, inhaled, or otherwise introduced into the human body;

p.  Making an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, even when, at the time the assertion is made, the person making lacks sufficient factually objective scientific, clinical or quantifiable evidence which substantiates the assertion; and

q.  Engaging in other conduct which similarly creates a likelihood of deception, confusion, or misunderstanding.

81.  At all relevant times, Defendant knowingly accepted the benefits of its deceptive conduct in the form of profits from the sale of JUUL e-cigarettes and JUUL pod nicotine salt cartridges.

82.  As a proximate result of the above-described deceptive acts, Plaintiffs and members of the Class and subclasses: (a) purchased and used JUUL nicotine products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchase of JUUL nicotine products; (c) suffered and/or will suffer additional economic losses in purchasing JUUL nicotine products to maintain their addiction; and (d) suffered and will suffer additional economic losses incidental to their addiction.

83.  As a direct and proximate result of these deceptive practices, Plaintiffs and the members of the Class and subclasses have been damaged and are entitled to recover actual damages, restitution, statutory damages and punitive damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

/ / /

/ / /

/ / /

## SECOND CAUSE OF ACTION

**(Violation of Unfair Competition Law California Business and Professional Code Sections 17200 *et seq.*)**

**Asserted by the California Subclass against all Defendants**

84. Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

85. Plaintiffs brings this claim on behalf of themselves and the Class.

86. The California Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200 *et seq.* ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

87. By reason of Defendant's above-described wrongful actions, inaction, and omissions, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning of the UCL.

88. Defendant's business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, in that those who purchased a JUUL device, the "consumer," bought "goods" from Defendant, i.e. the JUUL device and JUULpods.

89. Defendant's business practices as alleged herein are fraudulent because they are likely to deceive consumers into believing that the JUUL device is healthy, as advertised, when it fact, it is not and leads to nicotine addiction, amongst other harms.

90. Plaintiffs and Class members suffered (and continue to suffer) injury in fact and lost money or property as a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions including, *inter alia*, from their purchase of goods from Defendants.

91. Defendant's above-described wrongful actions, inaction, and omissions, the resulting in the purchase of their JUUL devices constitute "unfair" business acts and practices within the meaning of Business & Professions Code sections 17200 *et seq.*, in

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

that Defendant's conduct was substantially injurious to Plaintiffs and Class members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendant's conduct outweighs any alleged benefits attributable to such conduct.

92.    But for Defendant's misrepresentations and omissions, Plaintiffs and Class members would not have purchased the JUUL device or JUULpods.

93.    As a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions, the resulting purchases from Plaintiffs and Class members, have cost them money they otherwise would not have spent on JUUL products.

94.    Plaintiffs takes upon themselves enforcement of the laws violated by Defendant in connection with the sale of JUUL devices to Plaintiffs and the Class.  There is a financial burden incurred in pursuing this action and it would be against the interests of justice to penalize Plaintiffs by forcing them to pay attorneys' fees and costs from the recovery in this action.  Therefore, an award of attorneys' fees and costs is appropriate under Code of Civil Procedure section 1021.5.

## THIRD CAUSE OF ACTION

### (Fraud)

### Asserted by the Class and Subclass against All Defendants

95.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

96.    On the dates set forth in this Complaint, and within the three years prior to the filing of this lawsuit, Defendant fraudulently and deceptively sold JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes. Defendant this was false. On those same dates, Defendant fraudulently and deceptively failed to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it highly difficult for Plaintiffs to cease purchasing JUULpod refills, due to the addictive nature of the product. On the same dates, Defendant fraudulently and deceptively informed Plaintiffs that they would be able to cease purchasing JUULpods "anytime," when they knew this was false. On those same dates, Defendant

fraudulently and deceptively failed to disclose to Plaintiff that the nicotine benzoate salts in JUULpods delivered nicotine to blood plasma at a rate four times higher than a smoked Pall Mall cigarette, making the nicotine addiction associated with JUUL products stronger and more robust than that associated with traditional cigarettes or other e-cigarette products. Defendant made each of these misrepresentations and omissions to those similarly situated as Plaintiffs.

97.    Each of these misrepresentations and omissions were material at the time they were made, andconcerned material facts that were essential to the determination of Plaintiffs, and those similarly situated, as to whether to purchase a JUUL e-cigarette and JUULpod. Defendant had a fiduciary duty to accurately provide information to Plaintiffs, and those similarly situated. By failing to provide accurate information to Plaintiffs and those similarly situated, Defendant breached its duty to each of them. Defendant also made financial gainsfrom, and as a result of, its breach.

98.    Plaintiffs, and those similarly situated, detrimentally relied on Defendant's fraudulent omissions. Had Plaintiffs, and those similarly situated, been adequately informed as opposed to being intentionally deceived by Defendant, they would have acted differently by not purchasing a JUUL e-cigarette or JUULpod(s) and not subscribing to Defendant's "autoship" service.

99.    Plaintiffs allege the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendant:

100.    Defendant actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes from Plaintiffs and Class Members while simultaneously providing false or misleading evidence concerning nicotine content. Defendant actively concealed the benzoic acid content of the JUUL e-cigarettes, despite knowing that benzoic acid played a central role in determining the physiological effects of JUUL e-cigarettes. Defendant manipulated the formulations of JUUL devices and JUULpods to augment theirpotency and addictiveness, and did so without notifying Plaintiffs. Plaintiffs are unaware of, and

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

therefore unable to identify, the true names and identities of those specific individuals at JUUL or PAX responsible for such decisions.

101.    Defendant knew, or was negligent or reckless in not knowing, that the JUUL e-cigarettes were likely to cause nicotine addiction in smokers and posed greatrisks of addiction to children. Defendants further made misrepresentations about these risks, effects, operation, content, and other attributes of JUUL e-cigarettes. These misrepresentations include both omissions of nicotine warning, omission of facts regarding the increased potency and addictiveness of nicotine salts, misrepresentations about the amount of nicotine in JUULpods and the user's absorption thereof through use of JUUL. Defendants also misrepresented JUUL as a fun, healthy activity for young people, without disclosing the long-term health effects and the actual feeling of being addicted to nicotine.

102.    Defendants concealed material information regarding the effect of JUUL e-cigarettes at all times and made representations from the time when the JUUL e-cigarette was announced to present. Defendant still has not disclosed the truth about JUUL e-cigarettes, but instead has doubled down on these misrepresentations in the minds of the public through its social media efforts, the full scope of which is not yet fully known.

103.    Defendant concealed material information and made misrepresentations regarding the true nature of JUUL e-cigarettes' nicotine formula on JUUL's websites, interviews with the media, promotional materials, and through social media. Plaintiffs areaware of no document, communication, or other place or thing in which Defendants disclose consistent or truthful statements about JUUL e-cigarettes' potency, or its actual nicotine content. Such information is not disclosed on JUUL's website or in any marketing materials or advertising materials.

104.    Defendant concealed critical information from Plaintiffs and Class Members concerning the potency and effects of JUUL use, or made representations about the nicotine content and potency of the JUUL e-cigarettes that were false or misleading. Defendant actively concealed the truth about the real impact of JUUL e-cigarette use from Plaintiffs and Class Members at all times, even though it knew such information would be important

to a reasonable consumer. Defendants promised in JUUL's marketing materials that the JUUL e-cigarettes have certain qualities that simply do not exist.

105.   Defendant actively concealed material information about the potency of JUUL e-cigarettes for the purpose of inducing Plaintiffs and Class Members to purchase and/or use JUUL e-cigarettes so that Defendants could make money. Had Defendants disclosed the truth of their products, that JUUL e-cigarette was by design more physically addictive than cigarettes, such as in its advertisements or other materials or communications, reasonable consumers such as Plaintiffs and Class Members would have been aware of this fact, and would not have bought JUUL e-cigarettes, or would have used them in a way that posed fewer risks of creating or aggravating nicotine addiction.

106.   More information about each of these elements is provided in greater detail in the body of this complaint.

107.   By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs, and those similarly situated, to alter their positions to their detriment.

108.   Plaintiffs, and those similarly situated, justifiably and reasonably relied on Defendant's misrepresentations and/or omissions, and, accordingly, were damaged by the Defendant.

109.   As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs, and those similarly situated, have suffered damages in an amount equal to: (a) the amount that Defendant charged them; and (b) the amount they paid in excess of what they would have paid for a less addictive e-cigarette and refill cartridges containing nicotine in a non-salt formulation.

110.   Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiff, and those similarly situated.

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **FOURTH CAUSE OF ACTION**

### **(Unjust Enrichment)**

### **Asserted by the Class and Subclass against All Defendants**

111.   Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

112.   By means of Defendants' wrongful conduct alleged herein, Defendants knowingly sold JUUL Products to Plaintiffs and members of the Class in a manner that was unfair, unconscionable, and oppressive.

113.   Defendant knowingly received and retained wrongful benefits and monies from Plaintiffs and members of the Class. As a result, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

114.   Defendant's wrongful conduct as alleged herein resulted in Defendants' unjust enrichment at the expense of,  and to the detriment of, Plaintiffs and members of the Class.

115.   Defendant's unjust enrichment resulted directly and proximately from the conduct alleged herein.

116.   Under the common law doctrine of unjust enrichment, Defendant should not be allowed to retain the benefits it received, sans justification, from selling its JUUL Products in an unfair, unconscionable, and oppressive manner to Plaintiffs and Members of the Class.

117.   The financial benefits wrongfully and inequitably derived from Plaintiffs and Class Members by Defendant should be compelled to return to a common fund for the benefit of Plaintiffs and members of the Class.

118.   Plaintiffs and members of the Class have no adequate remedy at law.

## **FIFTH CAUSE OF ACTION**

### **(Negligent Failure to Warn)**

### **Asserted by the Class and Subclass against All Defendants**

119.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

120.   Defendants owed a duty to all persons, including youths and adolescents, who were reasonably foreseeable users of Defendant's products, to design, develop, formulate, test, and manufacture a product reasonably free of defect. JUUL had a duty to disclose to consumers, including youths and adolescents, the foreseeable risks associated with the use of JUUL devices and pods, including that the JUUL devices and pods were particularly unsafe for youths and adolescents due to their increased vulnerability to nicotine addiction.

121.   At the time Defendants manufactured, distributed and sold JUUL devices and JUUL pods, Defendants were aware that JUUL devices, when used with JUUL pods, had risks that were known and knowable in light of scientific and medical knowledge generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of the products, including that the JUUL devices and pods were particularly harmful to youths and adolescents.

122.   Defendants were negligent in that it knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious to nonsmokers, youths and adolescents, including the Plaintiffs and members of the class. However, Defendants failed to use reasonable care to warn Plaintiffs and class membersof the potentially harmful effects in the manner that a reasonable person would comprehend under the same or similar circumstances.

123.   The use of JUUL devices and JUUL pods presented a substantial danger of causing persons, particularly youths and adolescents, the harms of nicotine exposure and addiction as described herein when a JUUL device was used or misused with a JUUL pod in an intended or reasonably foreseeable way by youths and adolescents.

124.   Plaintiffs and Class memberswere not aware and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction that the JUUL device and JUUL pods pose, particularly to youths and adolescents. Plaintiffs and Class members were unable to appreciate the risks, dangers, and consequences of using a JUUL device because of Defendants' conduct. This

is particularly true for younger Class members, who lack life experience and possibly maturity of judgment.

125.   Defendants failed to exercise reasonable care and give adequate warnings or instructions to consumers, particularly youths and adolescents, including Plaintiffs and Class members.

### SIXTH CAUSE OF ACTION
### (Strict Liability – Manufacturing Defect)
### Asserted by the Class and Subclass against All Defendants

126.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

127.   Defendant routinely added more nicotine salt to the JUULpods than represented on the JUULpods labels or Defendants' advertising materials in the manufacturing of the JUULpods.

128.   Defendants routinely added more benzoic acid than the 4% solution specified in the '895 patent, which was the basis of the JUULpods formulation, in the manufacturing of the JUULpods.

129.   The variability in the nicotine salt content and/or benzoic acid in Defendants' products caused harm to Plaintiffs and Class members by augmenting the narcotic effects of Defendants' JUUL e-cigarettes, exacerbating the risks of nicotine addiction or further advancing existing nicotine addictions, causing harm to Plaintiff and Class members.

130.   These manufacturing defects in Defendant's products were a substantial cause of Plaintiffs' nicotine addiction or aggravation of their nicotine addiction.

### SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### Asserted by the Class and Subclass against All Defendants

131.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

132.   As alleged above, Defendants misrepresented the nicotine content of JUULpods on its label. Also as alleged above, Defendants misrepresented the potency and addictiveness of their nicotine salt formulation, the suitability of JUULpods as a "treat" to

be enjoyed with meals, the nicotine content of JUULpods, and the use of JUULpods as a cool, fun, healthy activity, rather than describe JUUL as what it actually is: a means of consuminghighly addictive dose of nicotine.

133.   When making these statements, Defendants wereaware that these representations were false or made them without knowledge of their truth or veracity.

134.   The negligent misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and all Class members to purchase the products at issue.

135.   Plaintiffs would not have purchased JUUL e-cigarettes, or would not have purchased the products on the same terms, had Plaintiffs known the truth of the facts that were misrepresented by Defendant.

136.   Plaintiffs and Class members are entitled to damages and other legal and equitable relief as a result.

## EIGHTH CAUSE OF ACTION

### (Breach of Implied Warranty)

### Asserted by the Class and Subclass against All Defendants

137.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

138.   Plaintiffs bring this claim on behalf of themselves and the Class.

139.   Defendants, through the acts and omissions alleged herein, in the sale, marketing, and promotion of JUUL products impliedly warranted that JUUL e-cigarettes and cigarettes were equivalent in terms of nicotine content, pharmacokinetics, and puff-count.

140.   Defendants are merchants with respect to the good which were sold to Plaintiff and the Class.

141.   A warranty that the JUUL products were in merchantable condition and fit for the ordinary purpose for which a smoking alternative or smoking cessation device would be used is implied by law.

142.   Defendants, through the acts and omissions alleged herein, in the sale, marketing, and promotion of JUUL products, impliedly warranted that JUUL e-cigarettes were safe, safer than cigarettes, and that they were equivalent to cigarettes in terms of nicotine content, pharmacokinetics, and puff-count.

143.   JUUL e-cigarettes are not fit for their intended purposes of offering an alternative to cigarettes because JUUL e-cigarettes, when used as intended or reasonably foreseeable, worsen or aggravate users' underlying nicotine addiction. Furthermore, by worsening users' addiction JUUL products have served as a gateway to increased cigarette use.

144.   JUUL also warranted to Plaintiffs and Class members through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, and its packaging materials that "1 JUULpod contains ~.7ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes." JUUL also warranted that JUULpods are "5% Strength" as stated on the front of JUUL's product packaging.

145.   JUUL products are in fact defective and fail to conform to JUUL's implied and express representations about JUULpods' safety, nicotine content, the pharmacokinetics of JUUL use, and JUULpods' cigarette equivalence.

146.   JUUL products are dangerously addictive and contain and deliver significantly more nicotine than JUUL represents. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harms caused by increased exposure to nicotine as described herein.

147.   By selling JUUL containing these defects to consumers like Plaintiffs and Class members when it already knew of the defects through internal testing and published reports, JUUL breached its implied warranties. Despite having received notice of these

defects, JUUL continually misrepresent the nature of its products and breach its implied warranties.

148.   Plaintiffs and the members of the Class were injured as a direct and proximate result of Defendant's breach of its implied warranties, which was a substantial factor in the harm they endured for the following reasons: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the actual facts; (b) they paid a premium price for the Product as a result of Defendant's misrepresentations and breach of its implied warranties; (c) they purchased Products that did not have the characteristics, qualities, or value affirmed and promised by Defendant, and (d) they were harmed by the defects and increased exposure to nicotine.

149.   Accordingly, Plaintiffs, on behalf of themselves and the Class members, respectfully request this Court to award all relevant damages for Defendant's breach of implied warranty.

## NINTH CAUSE OF ACTION

### (Breach of Express Warranty)

### Asserted by the Class and Subclass against All Defendants

150.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

151.   JUUL expressly warranted to Plaintiffs and Class members through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, and its packaging materials that "1 JUULpod contains ~.7ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes."

152.   JUUL expressly warranted that JUULpods are "5% Strength" as stated on the front of JUUL's product packaging.

153.   JUUL also expressly warranted that one JUULpod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials. JUUL also expressly warranted that JUUL use causes less, or at least no more, nicotine to enter the bloodstream than a cigarette and that one JUULpod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials.

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL

154.   These affirmations of fact became the basis of the bargain between JUUL and Plaintiffs and all Class members, thereby creating express warranties that JUUL products would conform to JUUL's affirmations of fact, representations, promises, and descriptions.

155.   As described herein, JUULpods actually contain 6.2% nicotine salt rather than 5% nicotine as advertised, and JUUL delivers more nicotine per puff than a traditional cigarette. JUULpods contain  significantly more nicotine than one pack of cigarettes.

156.   JUUL products are defective and fail to conform to JUUL's affirmations of fact about JUULpods' nicotine content, the pharmacokinetics of JUUL use, and JUULpods' cigarette equivalence in violation of JUUL's express warranties. JUUL products contain and deliver significantly more nicotine than JUUL represents. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harm caused by increased exposure to nicotine as described herein. By selling JUUL containing these defects to consumers like Plaintiffs and Class members when it already knew of the defects through internal testing and published reports, JUUL failed to adjust the nicotine content in JUUL products and breached its express warranty to provide JUUL products that were consistent with its affirmations of fact.

157.   Plaintiffs and the members of the Class were injured as a direct and proximate result of Defendant's breach of its express warranty because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the Product as a result of Defendant's misrepresentations and breach of its express warranties; and (c) they purchased Products that did not have the characteristics, qualities, or value affirmed and promised by Defendant.

158.   Accordingly, Plaintiffs, on behalf of themselves and the Class members, respectfully request this Court to award all relevant damages for Defendant's breach of express warranty

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.     For the greater of actual or compensatory damages according to proof;

2.     For restitution;

3.     For injunctive relief;

4.     For statutory damages, including as appropriate double or treble damages authorized by statute;

5.     Compensatory damages to be determined at trial;

6.     Punitive damages to be determined at trial;

7.     Reasonable attorneys' fees according to proof;

8.     Costs of suit; and

9.     For such further relief as this Court may deem just and proper.


Date:  September 17, 2019                    **ROBINSON CALCAGNIE, INC.**



                                         BY:  _/s/ Mark P. Robinson, Jr._____
                                               MARK P. ROBINSON, JR.
                                               KEVIN CALCAGNIE
                                               *Attorneys for Plaintiffs*

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Date:  September 17, 2019                    **ROBINSON CALCAGNIE, INC.**


BY:  /s/ Mark P. Robinson, Jr.
          MARK P. ROBINSON, JR.
          KEVIN CALCAGNIE
          *Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES; DEMAND FOR JURY TRIAL